**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**CHRISTOPHER L. CARDANI**
Christopher.Cardani@usdoj.gov
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, Oregon  97204-2902
Telephone: (503) 727-1000
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | Case No:  3:19-CV-01341-BR |
| **v.** | |
| **$10,198.00 IN UNITED STATES CURRENCY,** *in rem*, | **COMPLAINT *IN REM* FOR FORFEITURE** |
| **Defendant.** | |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Christopher Cardani, Assistant United States Attorney, for its Complaint

*in rem* for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to 21

U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

**Complaint in rem for Forfeiture**                                                                 **Page 1**

II.

Defendant, *in rem*, $10,198.00 in United States currency, was seized in the District of Oregon, and is now and during the pendency of this action will be within the jurisdiction of this Court.

III.

Defendant, *in rem*, $10,198.00 in United States currency, represents proceeds traceable to an exchange for controlled substances or was used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 801, *et. seq.*, and is forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the Declaration of Special Agent Ryan E. Parton, Federal Bureau of Investigation, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, Plaintiff, United States of America, prays that due process issue to enforce the forfeiture of Defendant, *in rem*, $10,198.00 in United States currency; that due notice be given to all interested persons to appear and show cause why forfeiture of this Defendant, *in rem*, should not be decreed; that due proceedings be had thereon; that this Defendant be forfeited to the United States; that the Plaintiff United States of America be awarded its costs and disbursements incurred in this action.

Dated this 23rd day of August, 2019.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Christopher Cardani*
CHRISTOPHER L. CARDANI
Assistant United States Attorney

**Complaint in rem for Forfeiture**                                            **Page 2**

**VERIFICATION**

I, RYAN E. PARTON declare, under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Special Agent with the Federal Bureau of Investigation and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.

*/s/ Ryan E. Parton*
**RYAN E. PARTON**
Special Agent
Federal Bureau of Investigation

**Complaint in rem for Forfeiture**                                    **Page 3**

## DECLARATION OF RYAN E. PARTON

I, Ryan E. Parton, do hereby declare:

## PURPOSE OF THIS DECLARATION

1.      This declaration is submitted in support of a complaint for forfeiture.  The information contained in this declaration is based on an investigation conducted by Federal Bureau of Investigation Special Agent Ryan E. Parton, which will show that $10,198.00 in U.S. currency seized from Tyrell Walton at the Portland International Airport is subject to forfeiture pursuant to 21 U.S.C § 881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq*. Information contained in this declaration is based upon my personal observations, training, and experience, and that of other law enforcement officers. This declaration does not contain each and every fact that I know about this investigation, only those necessary to establish probable cause to believe the seized currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## AGENT BACKGROUND AND TRAINING

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2012.  As a Special Agent with the FBI, my duties and responsibilities have included conducting criminal investigations for possible violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code.  I am currently assigned to the Portland Regional Organized Crime and Drug Task Force (PDX-TF).  PDX-TF is a coordinated effort by local and federal law enforcement officials to reduce illegal drug trafficking and related crimes in the Portland metropolitan area, specifically those areas directly related to air transportation.

**Declaration of Ryan E. Parton**                                          **EXHIBIT A   PAGE 1**

3.      Between July of 2012 and December of 2012, I received extensive training at the FBI Academy, Quantico, Virginia, which included topics related to the methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; the use of wiretaps; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits; the use of assets to facilitate unlawful drug trafficking activity; the laws permitting forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug trafficking offenses; and money laundering investigations.  I have become familiar with the types and amounts of profits made by dealers and distributors of controlled substances, and the methods, language, and terms which are used to disguise the source and nature of the profits from their illegal drug trafficking.  I have received additional formal training from the Oregon Narcotics Enforcement Association (ONEA), the International Narcotics Investigations Association (INIA), and the El Paso Intelligence Center's JETWAY Interdiction Training program, which all focused on drug and bulk cash smuggling occurring within mass transportation systems.

4.      Prior to being employed with the FBI, I was employed by the City of Cheyenne, Wyoming as a Police Officer for approximately seven years.  During that time, I obtained a Professional Peace Officer certification through the Wyoming Police Officer's Standards Board. To obtain this certification I was required to complete over 1000 hours of law enforcement training. This training included, but was not limited to, legal process, narcotics investigations, narcotics identification, narcotics interdiction techniques, and interview and interrogation techniques.

5.      I have participated in numerous narcotics investigations and search warrants seeking evidence of violations of Title 21 and Title 18 of the United States Code and violations of Chapter 475 (Controlled Substances) of the Oregon Revised Statutes (ORS).  These warrants covered the

**Declaration of Ryan E. Parton**                              **EXHIBIT A   PAGE 2**

search of locations to include: electronic communication devices; residences of drug traffickers and their co-conspirators/associates; drug manufacturing operations; and stash houses used as storage and distribution points for controlled substances and/or drug trafficking proceeds.

## BACKGROUND ON NARCOTICS PROCEEDS TRANSPORTED THROUGH AIRPORTS

6.     I know from my training and experience that drug traffickers transporting narcotics proceeds will frequently use airports to transport proceeds to a source city in order to purchase controlled substances, including marijuana, cocaine, heroin and methamphetamine.  I know from my training and experience that subjects trafficking narcotics proceeds often use airports to transport proceeds because of the speed of travel, the ability to maintain custody of the proceeds, and the low detection rate by law enforcement. I know from training and discussions with other law enforcement officers that these controlled substances and proceeds of the illegal sale of controlled substances are often found during airport interdictions.

7.     Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know Oregon is a marijuana source state to destination locations across the United States.  Current Oregon state laws permitting the recreational and medical growth, purchase, and possession of marijuana provide individuals with significant quantities of marijuana, which can be illegally shipped or transported to other states where marijuana is illegal and less available in order to derive substantially increased profits.

8.     Based on my experience, training and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when drug traffickers book airline travel for the purpose of purchasing narcotics. These travel indicators are inconsistent with normal travel and would only be justified under extraordinary circumstances.

**Declaration of Ryan E. Parton**                                    **EXHIBIT A   PAGE 3**

9.      I know from my training and experience that drug traffickers will often book their airline travel the same day or several days before their travel. This is often done because the availability of narcotics and narcotics proceeds changes on short notice. Drug traffickers have narrow windows to conduct drug transactions when a source of supply obtains narcotics. Otherwise the source will find another buyer.

10.      I know from my training and experience that drug traffickers will book one-way travel or have short turn around flights. This is commonly done because drug traffickers are delivering narcotics proceeds to their source of supply (and do not require a lot of time at their destination) or the drug trafficker is planning on transporting the purchased narcotics by car/train back to their originating city.

11.      I know from my training and experience that drug traffickers will transport their narcotics proceeds in carry-on bags or concealed within natural voids inside checked luggage. Drug traffickers know that law enforcement passenger and luggage screening is most thoroughly done when passengers are entering the airport terminal and that there is less stringent screening of checked luggage. Therefore, in my experience, the larger seizures of narcotics proceeds found in airports are typically concealed within checked baggage. Drug traffickers believe that their greatest threat for detection of narcotics proceeds within checked bags is from x-ray screening. For that reason, drug traffickers will often wrap currency in mylar to prevent detection by x-ray machines.

12.      I know from my training and experience that, when contacted by law enforcement, drug traffickers carrying narcotics proceeds will be deceptive about the amount of currency they are carrying.  Drug traffickers usually underestimate or are evasive about the quantity of the currency they are carrying because they are aware law enforcement can seize narcotics proceeds. Drug traffickers usually believe that if they are in possession of a lesser amount of currency that it

**Declaration of Ryan E. Parton**                                              **EXHIBIT A   PAGE 4**

is less likely to be seized by law enforcement.  It is common for drug traffickers carrying narcotics proceeds to change their statements regarding the amount of currency that they are carrying several times.

## SUMMARY OF INVESTIGATION

13.    On July 6, 2018, Task Force Officers (hereinafter "TFO") and Agents of the PDX-TF were conducting standard interdiction operations at Portland International Airport.  This specific interdiction operation focused on passengers who arrived on American Airlines flight 1316, which originated in Dallas, Texas and arrived in Portland, Oregon at approximately 10:50 a.m.

14.    During this operation, PDX-TF TFOs Timothy Osorio and Lance Hemsworth were dressed in civilian clothing.  Multnomah County Sheriff's Office K9 Deputy Bobby O'Donnell was also wearing civilian clothing but openly displayed his department issued "Deputy Sheriff" markings and badge.  Deputy O'Donnell's police K9 "Spencer" also wore a vest which prominently displayed "Sheriff's K9."

15.    At approximately 9:40 a.m. Deputy O'Donnell began contacting passengers deplaning within the C concourse from multiple flights and asked for consent to allow K9 Spencer to "sniff" the luggage carried by the passengers.  Prior to contacting a passenger later identified as Tyrell Walton, K9 Spencer sniffed approximately 40 bags with two alerts.  The alerts were determined to be a recreational marijuana user and an individual who had marijuana vape cartridges contained within their luggage.  At approximately 10:50 a.m. Deputy O'Donnell began working American Airlines flight 1316.

16.  Deputy O'Donnell's official police report states the following:

**Declaration of Ryan E. Parton**                                    **EXHIBIT A   PAGE 5**

At approximately 1050 hours Sgt. Lance Hemsworth, Det. Osorio and I were walking to gate C17 to work an arriving flight. While walking to the gate I noticed that the flight had already landed and passengers were beginning to exit. As I walked towards the front of the Jetway, I asked the first de-boarding passenger if K9 Spencer could sniff his bag. He replied, "Sure". I could see from the change in his breathing pattern that he had picked up the odor of drugs. I heard him "suck and purge" and then sit down quickly, like he was shocked with electricity. I have seen this change in behavior and that final response to the odor of drugs thousands of times in both training, "real life" deployments, and certifications where the presence of drug odor was confirmed.

I paid K9 Spencer with his reward and thanked the passenger. The passenger then continued towards baggage claim. I notified Sgt. Hemsworth and Det. Osorio of the K9 alert. They subsequently made contact with him near the McDonalds.

I continued to run the flight. K9 Spencer sniffed approximately 40 additional bags with no alerts.

17.     TFO Osorio and Hemsworth contacted the person in physical control of the bag K9 Spencer alerted to. The investigators identified themselves as law enforcement and informed the passenger that investigators contacted him based on the K9 alert on his carry-on luggage. The passenger was identified as Tyrell Walton (hereinafter "Walton").

18.     A non-custodial interview of Walton was conducted by TFOs Osorio and Hemsworth. During the interview, Walton informed TFO Osorio that he was carrying approximately $10,000 USD and it was contained within his carry-on luggage. Walton consented to the search of his luggage. As indicated by Walton, TFO Hemsworth located a large amount of US currency contained within two separate envelopes in Walton's carry-on luggage. The amount found within Walton's luggage was $10,198 USD.

19.     During the interview, Walton was asked about his trip. Walton stated his flight originated in Miami, Florida, and had a lay-over in Dallas, Texas prior to arriving at PDX. Walton stated that he paid approximately $300 for a one-way trip airfare. Walton purchased his ticket approximately two days prior. Walton stated he currently resided in the Kent, Washington area.

**Declaration of Ryan E. Parton**                                        **EXHIBIT A   PAGE 6**

When asked about the nature of his visit to Miami, Walton stated he was visiting a girlfriend named

"Marina Mitchell" and conducting "business".

20.    TFO Osorio inquired about the source of the money carried within Walton's

luggage.  TFO Osorio's official police report documented the following:

> I asked Mr. Walton if the currency he was traveling belonged to him. He initially told me
> that he was traveling with $10,000, and that $5,000 belonged to his girlfriend, and the
> remaining $5,000 was his. I asked Mr. Walton why he was traveling with his girlfriend's
> money. He stated it was currency that belonged to both of them. Mr. Walton then stated
> that $7,000 of the currency he was traveling with actually belonged to his girlfriend, and
> that $3,000 was his. Mr. Walton told me that he had traveled with $3,000 to Florida, and
> that his girlfriend had given him the $7,000 the day prior to his travel to PDX. Mr.
> Walton told me that his girlfriend had retrieved the $7,000 from an ATM. I found this
> suspicious since it appeared to be an amount that exceeded the daily ATM withdraw
> amount.

TFO Osorio's report later documented Walton claimed to be using the money to purchase a
Chevy Camaro.  TFO Osorio's official police report documented the following:

> I asked Mr. Walton what was the reason to travel with the currency he had in his
> possession. He told me that he was planning on purchasing a vehicle. I asked him what
> type of vehicle. He stated it was a Chevy Camaro. I asked him if he was purchasing the
> vehicle from a dealership or private party. He told me that it was a private party sale. I
> asked him for the name of the seller. Mr. Walton was not able to provide that information
> to me.

21.    TFO Osorio inquired about Walton's employment.  Walton stated he owned his

own car dealership called "Royal Sav'vy Inc" and made approximately $45,000 USD in 2017 and

$20,000 USD in 2018.   Walton further revealed there was no physical location for the dealership

other than operating out of his Kent, Washington home.  I have conducted Google searches for the

business "Royal Sav'vy Inc" and found no results.  TFO Osorio asked Walton if he banked at a

financial institution.  Walton stated he banked at Bank of America and Boeing Credit Union.  When

asked by TFO Osorio, Walton was unable to access any banking applications on his phone to

validate the origin of the carried US currency.

**Declaration of Ryan E. Parton**                                    **EXHIBIT A   PAGE 7**

22.     During the contact, Walton was found to have two separate cell phones in his possession.  Walton was asked if he had any communications on his cell phone that would verify or validate his story, the nature of his visit, or the source of the currency. Walton stated he did not.  While conversing with TFO Osorio, Walton began manipulating one of his cell phones. TFO Osorio instructed Walton not to delete any items, such as text messages or pictures, from his cell phone as the phone could possibly contain evidence of money laundering, exporting marijuana, and/or the sale of contraband.  Walton stated he was not deleting anything on his phone.  TFO Osorio was informed by TFO Hemsworth that he had observed Walton delete several text messages on one of his cell phones after being asked not to do so.  TFO Hemsworth then retrieved the cell phone from Walton's hand since it appeared that Walton was intentionally deleting messages on his cell phone.  TFO Osorio asked for consent to view Walton's current texts and pictures on his cell phone.  Walton unlocked the phones and allowed TFO Osorio to view the requested information.

23.     TFO Osorio's police report documented the following observations.  The photos captured from Walton's phone are also included below:

> I did not locate any text messages discussing the sale of a vehicle on the phone. I then asked Mr. Walton if I could view his recent text messages on his personal phone. Mr. Walton told me that I would not locate anything illegal on his cell phone, and allowed me to view his recent text messages. This was witnessed by Sgt. Hemsworth. I located a text conversation between Mr. Walton and "Dave". I located several text conversations that discussed the sale of marijuana and pictures of marijuana buds in what appeared to be in gallon size zip lock bags. Among the text conversations between Mr. Walton and Dave stating "Got that for you" "ok, what are we doing" "Half 10.50" "Yo I need that for 1k. That's not enough for me is not worth my time. Yo I'm, paying toll parking gas". The text conversation was preceded by a picture of marijuana buds. I also located a text conversation between Mr. Walton and "Able MIA" stating "lemme get a 8igh from u" "ok" "I cant go to the building thou lets meet downstairs" "ok just let me know, wyd tonight" "Was thinking of wynwood" "you" "imma fuck with u but I need about 1.5 tho" "yea thats cool".

**Declaration of Ryan E. Parton**                                    **EXHIBIT A   PAGE 8**





24.     It should be noted that the pictures referenced above contained time stamps which indicated the conversation occurred between April 25, 2018 and June 2, 2018, which is approximately 34 days prior to the interdiction of Walton.  In addition, based on my training and experience, I believe that the pictures and conversations relate to the purchase and sale of marijuana.

25.     At approximately 11:00 a.m. on July 6, 2018, Deputy O'Donnell was asked to "run" (to conduct a K9 sniff solely on the seized cash in an effort to determine the presence of narcotic odor) the cash that was found in Walton's carry-on luggage.  Prior to running K9 Spencer on the target bags, Deputy O'Donnell set up a "line" of bags in similar size and appearance. The bags were placed on the ground outside of gate C17. Deputy O'Donnell used K9 Spencer to "proof" the bags, the area and a bag containing uncirculated shredded U.S. Currency which was not associated to Walton.  K9 Spencer had no change of behavior during that deployment.

**Declaration of Ryan E. Parton**                                    **EXHIBIT A   PAGE 10**

26.    With no alerts to the blank bags, uncirculated shredded U.S. Currency, or the areas where the deployment occurred, TFO Hemsworth set a "line" in the same areas.  TFO Hemsworth placed the target bag, which contained Walton's currency and the uncirculated shredded U.S. Currency which was not associated to Walton, in random spots in the "line" that would be unknown to both Deputy O'Donnell and K9 Spencer.  Deputy O'Donnell ran the "line-up blind," meaning that he did not know the location of the subject U.S. currency.  TFO Hemsworth also stood out of Deputy O'Donnell's field of view to avoid "cuing" him or K9 Spencer.

27.    At approximately 1:40 p.m., Deputy O'Donnell deployed K9 Spencer on the line up.  Deputy O'Donnell recorded the results in his official police report as follows:

> With no alerts to the blank boxes, clean shredded U.S. Currency or the area, I had Sgt. Hemsworth set me a "line-up" in the same areas. I instructed him to put the target box containing the suspected drug contaminated U.S. Currency in a random spot in the "line-up" that would be unknown to both me and K9 Spencer. I would be running the "line-up blind". I also asked him to stay out of my field of view to avoid him "cuing me" or my K9.

> At approximately 1340 hours I deployed K9 Spencer on that line up. The line up now contained the suspected drug contaminated U.S. Currency ($10,198.00) that was found in Mr. Walton's carry-on.  As K9 Spencer approached box #6, I saw him have a change of behavior. His tail began to wag rapidly and his breathing became more focused and intense. I've only seen this behavior from him during certifications, training and field deployments where the presence of drug odor was confirmed. I heard him "suck and purge" and then sit down quickly.

> I "paid" K9 Spencer with his jute toy. I told Sgt. Hemsworth of the alert to box #6. I was told that box was the target box. It should be noted that the box containing the shredded U.S. Currency was in position #3.

28.    Based on the totality of the circumstances, the information learned from interviewing Walton, the information observed within Walton's cell phone, and the dog alert, the currency was administratively seized by law enforcement as proceeds from illegal activity and/or was used or intended to be used to facility illegal activity.  Mr. Walton was issued a receipt for the seizure of the $10,198.

**Declaration of Ryan E. Parton**                                           **EXHIBIT A   PAGE 11**

29.     A criminal history check on Walton was later conducted.  In September 1998 Tyrell Walton was convicted in the United States District Court for the District of Alaska of Conspiracy in Relation to Cocaine Distribution (Count One), and Possession of Cocaine with Intent to Distribute (Counts Two and Three).  He was sentenced to serve 188 months in federal prison. Records indicate that this sentence was later reduced in 2008 to 151 months based on retroactive application of crack cocaine sentencing guidelines.  In addition, records I have reviewed indicate that in May 2019 Tyrell Klavon Walton was convicted of:  Possession of Cannabis (More than 20 grams); Controlled Substance Possession; and Possession with Intent to Use Drug Paraphernalia, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.  He received a sentence of probation.

## CONCLUSION

30.     Based on the foregoing information, I have probable cause to believe, and do believe, that the $10,198 in U.S. currency seized from Tyrell Walton is subject to forfeiture pursuant to 21 U.S.C. §881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C § 801, *et. seq*.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Executed this 22nd day of August 2019.


*/s/ Ryan E. Parton*
RYAN E. PARTON
Special Agent
Federal Bureau of Investigation


**Declaration of Ryan E. Parton**                                    **EXHIBIT A   PAGE 12**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

United States of America

**DEFENDANTS**

$10,198 in United States currency, in rem

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Multnomah
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Christopher L. Cardani - United States Attorney's Office
1000 SW Third Ave., Suite 600 Portland, OR 97204

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☒ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☒ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
21:881(a)(6) / 21:801 et. seq.,

Brief description of cause:
proceeds traceable to an ex. of a contr.sub/proceeds used or intended to be used to facilitate narc. traff.

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE    8/23/2019

SIGNATURE OF ATTORNEY OF RECORD    /s/ Christopher L. Cardani

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____